PETERSON, J.
David A. Siegel appeals the trial court’s resolution of a disagreement that arose with his former wife, Bettie, over the tax consequences of two provisions of their marital settlement agreement. The first provision involved the federal income tax consequences of an asset David transferred to Bettie, and the second involved whether real property taxes on the marital residence received by Bettie were to be prorated between the parties for the year of transfer.
The marital settlement agreement required David to transfer to Bettie titles to real properties known as the “Taft Industrial Property” and the “Chase Road House,” the latter being the former marital residence.
The marital settlement agreement provided in part:
6. SETTLEMENT TERMS. This Marital Settlement Agreement is intended to resolve all business and marital property issues, and all claims between the parties (except for those issues and claims arising under this Marital Settlement Agreement), including, but not limited to, any claims for equitable distribution of assets and properties, as well as any claims for alimony. DAS [David] shall pay to BIS [Bettie] or her estate the sum of $200,000,000.00 in consideration for which BIS shall transfer, convey, and assign to DAS all of her stock and property interests in Central Florida Investments, Inc. (“CFI”), Westgate Resorts, Ltd. (“Resorts”), their related and affiliated entities identified as signatories to that certain Stock Pledge and Escrow Agreement executed by the parties of even date herewith, and all other entities, marital properties and assets that are owned either jointly or individually by DAS and BIS (except those specifically reserved to BIS as provided for elsewhere in this Settlement Agreement), which foregoing entities are hereinafter referred to singly or in the aggregate as the “CFI Entities.”
7. PAYMENT OF CONSIDERATION DAS agrees to pay the settlement amount described in paragraph 6 hereof as follows:
(a) Cash Payments. DAS shall pay to BIS the total cash sum of $155,237,-004.70, which total cash sum shall be determined after, and shall be net of the payment by DAS of any and all federal, state and/or local income, franchise, sales, excise, intangible personal property, tangible personal property, documentary stamp, or transfer taxes, taxes imposed on such payments, or any and all taxes of any description or type, as well as all interest and penalties associated therewith (collectively, the “Taxes”), that DAS, BIS or any other person or entity shall incur with respect to the payment of $155,237,004.70 (or with respect to any restructuring, reorganization, transfer, conveyance, financing, or distribution related or attributable to such payments or the CFI Entities). DAS agrees to pay as part of, and in addition to, any sums to be paid or properties to be transferred to BIS all such Taxes attributable to the payments made to BIS by DAS, whether as a shareholder or former shareholder of one of the CFI Entities or otherwise, and whether such Taxes are now determined or assessed at some future date (if assessed at a future date, DAS shall further pay any and all related penalties, interest, and legal or other professional fees attributable thereto), which net sum of $155,237,004.70 shall be paid to BIS as follows:
*701 * * *
(b) Transfer of Properties. The balance of the total settlement amount set forth in paragraph 6 hereof shall be satisfied by the transfer, conveyance, and assignment by DAS to BIS at the closing of this Marital Settlement Agreement, net of, and after the payment of, all Taxes, of all right, title, or interest that he has or may have in the following marital properties: (i) the Chase Road House ..., (iv) all of the Taft Industrial property which is owned by CFI,.... DAS shall pay and indemnify BIS from and against any Taxes or other liability to BIS from the transfer, conveyance and assignment to her of such properties; provided, however, that BIS shall be responsible for any Taxes incurred solely as a result of any sale by her of any such assets or properties subsequent to the transfer, conveyance and assignment by DAS. DAS shall also promptly pay all Taxes, costs, and expenses incurred in connection with completing such assignment, transfer, and conveyance of the above described properties and assets to BIS. The parties agree that the transfer of the Taft Industrial property may be structured as a tax-free exchange transaction pursuant to the provisions of Section 1031 of the Internal Revenue Code of 1986, as amended. BIS agrees to cooperate and assist in such transaction; provided, however, that BIS shall not incur any liability, including, but not limited to any Tax liability, in connection with the structuring of such transaction as a tax-free exchange and, in any event, DAS shall pay any and all Tax liability that actually does result from or is otherwise attributable to such exchange. The General Warranty Deed to the Taft Property shall be signed and delivered to Gray, Harris and Robinson, P.A., an escrow agent, which shall record the Warranty Deed and deliver it promptly thereafter to BIS, unless the 1031 exchange is consummated within thirty (30) days after Closing, in which case the recorded Warranty Deed to the exchanged properties shall instead be delivered by said escrow agent to BIS in lieu of the deed to the Taft property and in which case the Deed to the Taft Property shall be returned unrecorded by the escrow agent to DAS. BIS shall first approve the exchanged properties and they shall be free and clear of liens, encumbrances, mortgages and environmental liability. DAS agrees to convey all properties to BIS pursuant to this sub-paragraph 7(b) by General Warranty Deed, free and clear of all hens, mortgages or other encumbrances, and shall be conveyed without expense of any kind, including Taxes, to BIS....
We interpret the provision relating to the Taft property as requiring David to either deliver to Bettie a warranty deed describing the Taft property or a warranty deed describing some then unknown property exchanged for the Taft property. This interpretation is supported by the language of the agreement that provides:
[T]he ... Deed to the exchanged properties shall be delivered ... to BIS in lieu of the deed to the Taft property and in which case the Deed to the Taft property shall be returned ... to DAS.
This interpretation is also supported by the provision that Bettie had the right to first approve the property she was to receive in lieu of the Taft property. Thus, David was to inform Bettie of the property she was to receive in lieu of the Taft property before the tax free transaction was completed for her approval.
However, the tax free transaction that David contrived varied from what we believe to be the correct interpretation of the provision dealing with the Taft property. David could not convey the Taft property to Bettie because he did not hold title. Title was held by his wholly-owned corporation, Central Florida Investments (CFI). His tax basis in the stock of CFI was approximately $680,000, while the Taft property owned by CFI had a market value of approximately 2.5 million dollars. *702 In order to personally convey the Taft property to Bettie, he would either have to buy it from the corporation for 2.5 million dollars or receive it in redemption of his stock. The redemption would require him to pay capital gains tax on the difference between the 2.5 million dollars and his $680,000 basis, to wit: $1,820,000.
In order to avoid paying the capital gains tax on $1,820,000, David had to involve still another one of his wholly-owned corporations, Oak Island 80, Inc., (Oak Island) in the tax free exchange. David’s basis in the stock of Oak Island was $1,800,000. By exchanging real property between CFI and Oak Island, Oak Island became the owner of the Taft property. The tax result: Oak Island became the owner of the 2.5 million dollar Taft property and David now had a basis of $1,800,000 in the corporation that owned it, rather than the former basis of $680,000 when CFI owned the property.
But David’s next step in avoiding the payment of a capital gains tax was to transfer the Oak Island stock to Bettie rather than convey the Taft property directly to her. The transfer of the stock of a corporation that owned the Taft property, rather than a conveyance of the title to the Taft property, was not contemplated by a reasonable interpretation of the marital settlement agreement, nor was it acceptable to Bettie. Her complaint: instead of receiving the conveyance by warranty deed with a basis in the Taft property of 2.5 million dollars, she would receive stock having a basis of 1.8 million dollars with the title to the Taft property locked in the corporation, Oak Island. By transferring stock rather than title to the Taft property, David would escape any immediate gain and would impose a potential taxable gain on Bettie of $700,000. We agree with the trial court that the detriment to Bettie was not contemplated by the marital settlement agreement and affirm that portion of the trial court’s order finding in Bettie’s favor.
We agree with David, however, on the second issue involving the proration of real estate taxes on the former marital home. The marital agreement makes no provision for the proration of any taxes and reliance on any routine practice of prorating real estate taxes in real estate is misplaced. The hearing before the trial judge was not an evidentiary hearing and the record contains only the arguments of counsel. No evidence of a routine practice of proration was ever presented. E.g., Alexander v. Allstate Insurance Co., 388 So.2d 592 (Fla. 5th DCA 1980). Further, we are unaware of any statute providing for the daily accrual of real estate taxes in Florida as asserted by Bettie. Ad valorem property taxes become a lien on assessed property on January 1st of the year the taxes are levied. § 197.122, Fla. Stat. (1997). The taxes do not become due and payable until November 1st of the year of the assessment. § 197.333, Fla. Stat. (1997).
We vacate the portion of the trial court’s order requiring David to pay Bettie $57,-606, the “prorated portion of the marital residence real estate taxes.”
AFFIRMED IN PART; REVERSED IN PART.
ANTOON, C.J., and COBB, J., concur.